**Fill in this information to identify the case:**

Debtor 1 _____Jamie M. Haas_____

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: __Eastern__ District of __PA__

Case number __18-11474-AMC_____

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

---

### Part 1:   Identify the Claim

**1. Who is the current creditor?**

Fulton Bank of New Jersey
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Fulton Bank of New Jersey | Fulton Bank of New Jersey |
| Name | Name |
| Special Assets - Jessica Fuller, One Penn Square | Special Assets - Jessica Fuller, One Penn Square |
| Number       Street | Number       Street |
| Lancaster, PA  17604 | Lancaster, PA  17604 |
| City                State            ZIP Code | City                State            ZIP Code |
| Contact phone _____ | Contact phone _____ |
| Contact email _____ | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes.  Who made the earlier filing? _____

---

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☐ No

☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __8666__ ____ ____ ____

7. **How much is the claim?**   $ __11,318.63__ . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

__Mortgage / Note__

9. **Is all or part of the claim secured?**

☐ No

☒ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe:   __4419 Richmond Street, Philadelphia, Pennsylvania 19137__

**Basis for perfection:**   __Mortgage/Note__

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $ __11,318.63__

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ __11,318.63 *__

*Please see Addendum.

**Annual Interest Rate** (when case was filed) __7.750000__%

☐ Fixed

☒ Variable

10. **Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

11. **Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).     $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.     $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
MM / DD / YYYY

/s/ Raymond M. Kempinski, Esq.
_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name     Raymond M. Kempinski
_____
First name                    Middle name                    Last name

Title     Attorney for creditor
_____

Company     McCabe, Weisberg & Conway, LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     123 S. Broad Street, Suite 1400
_____
Number          Street
Philadelphia, PA 19109
_____
City                                          State     ZIP Code

Contact phone     215-790-1010          Email     ecfmail@mwc-law.com

**Mortgage Proof of Claim Attachment**

(12/15)

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.**

| Part 1: Mortgage and Case Information | | Part 2: Total Debt Calculation | | Part 3: Arrearage as of Date of the Petition | | Part 4: Monthly Mortgage Payment | |
|---|---|---|---|---|---|---|---|
| Case number: | 18-11474-AMC | Principal balance: | $9,924.61 | Principal & interest due: | N/A | Principal & interest: | N/A |
| Debtor 1: | Jamie M. Haas | Interest due: | $1,098.19 | Prepetition fees due: | N/A | Monthly escrow: | N/A |
| Debtor 2: | | Fees, costs due: | $295.83 | Escrow deficiency for funds advanced: | N/A | Private mortgage insurance: | N/A |
| Last 4 digits to identify: | 8666 | Escrow deficiency for funds advanced: | $0.00 | Projected escrow shortage: | N/A | Total monthly payment:* | N/A |
| Creditor: | Fulton Bank of New Jersey | Less total funds on hand: | $0.00 | Less funds on hand: | N/A | | |
| Servicer: | Fulton Bank of New Jersey | Total debt: | $11,318.63 | Total prepetition arrearage:* | N/A | *Please see Addendum | |
| Fixed accrual/daily simple interest/other: | other | | | | | | |

**Part 5 : Loan Payment History from First Date of Default**

| | | | | | | How Funds were Applied/Amount Incurred | | | | | | Balance After Amount Received/Incurred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Account Activity | | | | | | | | | | |
| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin,int& esc past due balance | H. Amount to Principal | I. Amount to Interest | J. Amount to Escrow | K. Amount to Fees or Charges | L. Unapplied Funds | M. Principal Balance | N. Accrued Interest Balance | O. Escrow Balance | P. Fees/Charges Balance | Q. Unapplied Funds Balance |
| 08/27/2016 | $50.00 | | | Installment Payment Due | 08/27/2016 | $50.00 | | | | | | $9,924.61 | | $0.00 | $0.00 | $0.00 |
| 09/27/2016 | $50.00 | | | Installment Payment Due | 08/27/2016 | $100.00 | | | | | | $9,924.61 | | $0.00 | $0.00 | $0.00 |
| 10/13/2016 | | | $2.73 | Late Charge Assessed | 08/27/2016 | $100.00 | | | | -$2.73 | | $9,924.61 | | $0.00 | -$2.73 | $0.00 |
| 10/27/2016 | $50.00 | | | Installment Payment Due | 08/27/2016 | $150.00 | | | | | | $9,924.61 | | $0.00 | -$2.73 | $0.00 |
| 11/14/2016 | | | $2.56 | Late Charge Assessed | 08/27/2016 | $150.00 | | | | -$2.56 | | $9,924.61 | | $0.00 | -$5.29 | $0.00 |
| 11/27/2016 | $50.00 | | | Installment Payment Due | 08/27/2016 | $200.00 | | | | | | $9,924.61 | | $0.00 | -$5.29 | $0.00 |
| 12/13/2016 | | | $2.82 | Late Charge Assessed | 08/27/2016 | $200.00 | | | | -$2.82 | | $9,924.61 | | $0.00 | -$8.11 | $0.00 |
| 12/27/2016 | $50.00 | | | Installment Payment Due | 08/27/2016 | $250.00 | | | | | | $9,924.61 | | $0.00 | -$8.11 | $0.00 |
| 01/10/2017 | | $3.85 | | Irregular Payment | 08/27/2016 | $250.00 | | $3.85 | | | | $9,924.61 | | $0.00 | -$8.11 | $0.00 |
| 01/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $300.00 | | | | | | $9,924.61 | | $0.00 | -$8.11 | $0.00 |
| 02/10/2017 | | | $2.61 | Late Charge Assessed | 08/27/2016 | $300.00 | | | | -$2.61 | | $9,924.61 | | $0.00 | -$10.72 | $0.00 |
| 02/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $350.00 | | | | | | $9,924.61 | | $0.00 | -$10.72 | $0.00 |
| 03/15/2017 | | | $3.03 | Late Charge Assessed | 08/27/2016 | $350.00 | | | | -$3.03 | | $9,924.61 | | $0.00 | -$13.75 | $0.00 |
| 03/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $400.00 | | | | | | $9,924.61 | | $0.00 | -$13.75 | $0.00 |
| 04/12/2017 | | | $2.57 | Late Charge Assessed | 08/27/2016 | $400.00 | | | | -$2.57 | | $9,924.61 | | $0.00 | -$16.32 | $0.00 |
| 04/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $450.00 | | | | | | $9,924.61 | | $0.00 | -$16.32 | $0.00 |
| 05/12/2017 | | | $2.81 | Late Charge Assessed | 08/27/2016 | $450.00 | | | | -$2.81 | | $9,924.61 | | $0.00 | -$19.13 | $0.00 |
| 05/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $500.00 | | | | | | $9,924.61 | | $0.00 | -$19.13 | $0.00 |
| 06/12/2017 | | | $2.95 | Late Charge Assessed | 08/27/2016 | $500.00 | | | | -$2.95 | | $9,924.61 | | $0.00 | -$22.08 | $0.00 |
| 06/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $550.00 | | | | | | $9,924.61 | | $0.00 | -$22.08 | $0.00 |
| 07/13/2017 | | | $2.95 | Late Charge Assessed | 08/27/2016 | $550.00 | | | | -$2.95 | | $9,924.61 | | $0.00 | -$25.03 | $0.00 |
| 07/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $600.00 | | | | | | $9,924.61 | | $0.00 | -$25.03 | $0.00 |
| 08/11/2017 | | | $2.81 | Late Charge Assessed | 08/27/2016 | $600.00 | | | | -$2.81 | | $9,924.61 | | $0.00 | -$27.84 | $0.00 |
| 08/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $650.00 | | | | | | $9,924.61 | | $0.00 | -$27.84 | $0.00 |
| 09/12/2017 | | | $3.15 | Late Charge Assessed | 08/27/2016 | $650.00 | | | | -$3.15 | | $9,924.61 | | $0.00 | -$30.99 | $0.00 |
| 09/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $700.00 | | | | | | $9,924.61 | | $0.00 | -$30.99 | $0.00 |
| 10/13/2017 | | | $3.06 | Late Charge Assessed | 08/27/2016 | $700.00 | | | | -$3.06 | | $9,924.61 | | $0.00 | -$34.05 | $0.00 |
| 10/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $750.00 | | | | | | $9,924.61 | | $0.00 | -$34.05 | $0.00 |
| 11/10/2017 | | | $2.76 | Late Charge Assessed | 08/27/2016 | $750.00 | | | | -$2.76 | | $9,924.61 | | $0.00 | -$36.81 | $0.00 |
| 11/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $800.00 | | | | | | $9,924.61 | | $0.00 | -$36.81 | $0.00 |
| 12/13/2017 | | | $3.25 | Late Charge Assessed | 08/27/2016 | $800.00 | | | | -$3.25 | | $9,924.61 | | $0.00 | -$40.06 | $0.00 |
| 12/14/2017 | | | $250.00 | Attorney Fees | 08/27/2016 | $800.00 | | | | -$250.00 | | $9,924.61 | | $0.00 | -$290.06 | $0.00 |
| 12/27/2017 | $50.00 | | | Installment Payment Due | 08/27/2016 | $850.00 | | | | | | $9,924.61 | | $0.00 | -$290.06 | $0.00 |
| 01/12/2018 | | | $2.96 | Late Charge Assessed | 08/27/2016 | $850.00 | | | | -$2.96 | | $9,924.61 | | $0.00 | -$293.02 | $0.00 |
| 01/27/2018 | $50.00 | | | Installment Payment Due | 08/27/2016 | $900.00 | | | | | | $9,924.61 | | $0.00 | -$293.02 | $0.00 |
| 02/09/2018 | | | $2.81 | Late Charge Assessed | 08/27/2016 | $900.00 | | | | -$2.81 | | $9,924.61 | | $0.00 | -$295.83 | $0.00 |
| 02/27/2018 | $50.00 | | | Installment Payment Due | 08/27/2016 | $950.00 | | | | | | $9,924.61 | | $0.00 | -$295.83 | $0.00 |
| 03/05/2018 | | | | Bankruptcy Filed | 08/27/2016 | $950.00 | | | | | | $9,924.61 | | $0.00 | -$295.83 | $0.00 |

# __Addendum__

This claim is a total debt claim pursuant to the terms of the Credit Agreement. Please see breakdown of all amounts due below.

Principal balance:     $9,924.61

Interest due:     $1,098.19

Fees, costs due:     $295.83

      Total debt:     $11,318.63

Fees, costs due:

| | | | | | |
|---|---|---|---|---|---|
| 10/13/2016 | Late Charge | $2.73 | 08/11/2017 | Late Charge | $2.81 |
| 11/14/2016 | Late Charge | $2.56 | 09/12/2017 | Late Charge | $3.15 |
| 12/13/2016 | Late Charge | $2.82 | 10/13/2017 | Late Charge | $3.06 |
| 02/10/2017 | Late Charge | $2.61 | 11/10/2017 | Late Charge | $2.76 |
| 03/15/2017 | Late Charge | $3.03 | 12/13/2017 | Late Charge | $3.25 |
| 04/12/2017 | Late Charge | $2.57 | 12/14/2017 | Attorney Fees | $250.00 |
| 05/12/2017 | Late Charge | $2.81 | 01/12/2018 | Late Charge | $2.96 |
| 06/12/2017 | Late Charge | $2.95 | 02/09/2018 | Late Charge | $2.81 |
| 07/13/2017 | Late Charge | $2.95 | | | |

                Total    $295.83



# STATE OF NEW JERSEY

## DEPARTMENT OF BANKING AND INSURANCE
### DIVISION OF BANKING

## CERTIFICATE OF APPROVAL

## AMENDMENT TO CERTIFICATE OF INCORPORATION – NAME CHANGE

I, Thomas B. Considine, Commissioner of Banking and Insurance of the State of New Jersey, do hereby find that the amendment to the Certificate of Incorporation of **The Bank** with its principal office in **Mount Laurel,** Burlington County, changing its name to **Fulton Bank of New Jersey** as set forth in the foregoing certificate of amendment is for a purpose authorized by law and that all the conditions and requirements in Article 19 of The Banking Act of 1948, as amended, and elsewhere in said Act specified as prerequisites to an amendment to a certificate of incorporation have been satisfied, and I do hereby approve the same and cause it to be filed in this Department.

_____
Thomas B. Considine
Commissioner

Dated: *OCT. 12, 2011*

PREPARED BY:
    Loan Documentation,
    The Bank,
    533 Fellowship Road,
    Mount Laurel, NJ 08054,
    

WHEN RECORDED MAIL TO:
    The Bank
    Loan Operations Scanning
    P.O. Box 25091
    Lehigh Valley, PA
    18002-5091

PARCEL IDENTIFICATION
    NUMBER:

RECORDATION REQUESTED BY:
    The Bank
    Voorhees Office
    533 Fellowship Road
    Mount Laurel, NJ  08054

Page: 1 of 21
03/22/2011 02:36P

This Document Recorded
03/22/2011
02 36PM
Doc Code  M    Commissioner of Records, City of Philadelphia

Doc Id
Receipt #:
Rec Fee  170.00

**FOR RECORDER'S USE ONLY**



## OPEN - END MORTGAGE AND SECURITY AGREEMENT

*(This instrument is an open-end mortgage and secures future advances pursuant to 42 Pa. C.S. §§ 8143 and 8144, Act No. 126 of 1990)*

Amount Secured Hereby:    $10,000.00

THIS MORTGAGE dated October 15, 2010, is made and executed between Jamie Haas (aka Jamie M Haas), whose address is 4419 Richmond Street, Philadelphia, PA  19137 (referred to below as "Grantor") and The Bank, whose address is 533 Fellowship Road, Mount Laurel, NJ 08054 (referred to below as "Lender").

GRANT OF MORTGAGE.  For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses

M 20

## MORTGAGE
### (Continued)

and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Philadelphia County, Commonwealth of Pennsylvania:

**City Of Philadelphia**
**Deed Recorded: 01/07/2005, Ref #** ▮▮▮▮▮▮▮
**See Attached Exhibit A**

The Real Property or its address is commonly known as  4419 Richmond Street, City Of Philadelphia, PA  19137.

**REVOLVING LINE OF CREDIT.**  This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower unless Borrower fails to comply with all the terms of the Credit Agreement.  Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement.  It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance, plus interest.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE.  THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.**  Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.**  Grantor warrants that:  (a) this Mortgage is executed at Borrower's request and not at the request of Lender;  (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property;  (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor;  (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.**  Except as otherwise provided in this Mortgage, Borrower

# MORTGAGE
## (Continued)

shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.**  Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.**  Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of, or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances.  Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor.  The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

## MORTGAGE
### (Continued)

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this

# MORTGAGE
## (Continued)

Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area. Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of Borrower's credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

# MORTGAGE
## (Continued)

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had. Grantor's obligation to Lender for all such expenses shall survive the entry of any mortgage foreclosure judgment.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the

# MORGAGE
## (Continued)

Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.**  Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons.  In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.**  Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.**  All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.**  The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.**  The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien.  Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.**  Grantor shall not enter into any agreement with the holder of any mortgage or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender.  Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.**  The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.**  If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award.  Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.**  If all or any part of the Property is condemned by eminent

## MORGAGE
### (Continued)

domain proceedings or by any proceeding or purchase in lieu of condemnation. Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

# MORTGAGE
(Continued)                                                          Page 9

Addresses. The mailing addresses of Grantor (debtor) and Lender (secured party) from
which information concerning the security interest granted by this Mortgage may be
obtained (each as required by the Uniform Commercial Code) are as stated on the first page
of this Mortgage.

**FURTHER ASSURANCES; ADDITIONAL AUTHORIZATIONS.** The following provisions relating
to further assurances and additional authorizations are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor
will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or
to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or
rerecorded, as the case may be, at such times and in such offices and places as Lender may
deem appropriate, any and all such mortgages, deeds of trust, security deeds, security
agreements, financing statements, continuation statements, instruments of further
assurance, certificates, and other documents as may, in the sole opinion of Lender, be
necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1)
Borrower's and Grantor's obligations under the Credit Agreement, this Mortgage, and the
Related Documents, and (2) the liens and security interests created by this Mortgage on
the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by
law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs
and expenses incurred in connection with the matters referred to in this paragraph.

**Additional Authorizations.** If Grantor fails to do any of the things referred to in the
preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's
expense. For such purposes, Grantor hereby irrevocably authorizes Lender to make,
execute, deliver, file, record and do all other things as may be necessary or desirable, in
Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph. It
is understood that nothing set forth herein shall require Lender to take any such actions.

**FULL PERFORMANCE..** If Borrower and Grantor pay all the Indebtedness when due, terminates
the credit line account, and Grantor otherwise performs all the obligations imposed upon
Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction
of this Mortgage and suitable statements of termination of any financing statement on file
evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if
permitted by applicable law, any reasonable termination fee as determined by Lender from time
to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following
happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in
connection with the Credit Agreement. This can include, for example, a false statement about
Borrower's or Grantor's income, assets, liabilities, or any other aspects of Borrower's or
Grantor's financial condition. (B) Borrower does not meet the repayment terms of the Credit
Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights
in the collateral. This can include, for example, failure to maintain required insurance, waste or
destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account,
transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's
permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for
prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any

# MORTGAGE
## (Continued)

time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving such notices as required by applicable law, to declare the entire Indebtedness immediately due and payable.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor

# MORTGAGE
## (Continued)

hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Unless otherwise provided by applicable law, any notice required to be given under this Mortgage shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage and notices pursuant to 42 Pa. C.S.A. Section 8143, et. seq., shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all

# MORTGAGE
## (Continued)

Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**ADVANCE MONEY MORTGAGE.** (A) This Mortgage secures future advances made pursuant to the Credit Agreement or Related Documents. Without limiting the foregoing, this Mortgage secures all advances made by Lender or Banks of any kind or nature described in 42 Pa. C.S.A. § 8144. (B) If Grantor sends a written notice to Lender which purports to limit the indebtedness secured by this Mortgage and to release the obligation of Lender to make any additional advances to or for the benefit of Grantor, such a notice shall be ineffective as to any future advances made: (1) to enable completion of the improvements on the Real Property for which the loan secured hereby was originally made; (2) to pay taxes, assessments, maintenance charges and insurance premiums; (3) for costs incurred for the protection of the Property or the lien of this Mortgage; (4) on account of expenses incurred by Lender by reason of a default of Borrower or Grantor hereunder or under the Related Documents or under the Credit Agreement; and (5) on account of any other costs incurred by Lender to protect and preserve the Property or the lien of this Mortgage. It is the intention of the parties hereto that any such advance made by Lender after any such notice by Grantor shall be secured by the lien of this Mortgage on the Property.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Property, this Mortgage will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania. In all other respects, this Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Mortgage is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Credit Agreement and this Mortgage has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of New Jersey.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Camden County, State of New Jersey.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights

# MORTGAGE
**(Continued)**                                        **Page 13**

under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successor Interests.** The terms of this Mortgage shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means Jamie Haas and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated October 15, 2010; with credit limit of $10,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means Jamie Haas (aka Jamie M Haas).

# MORTGAGE
## (Continued)

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.   The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.**  The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.   The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage.

**Lender.** The word "Lender" means The Bank, its successors and assigns.  The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.**  The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

# MORTGAGE
## (Continued)

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _____    (Seal)
Jamie Haas (aka Jamie M Haas)

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **The Bank**, herein is as follows:

Voorhees Office, 533 Fellowship Road, Mount Laurel, NJ  08054

_____
Attorney   or Agent   for Mortgagee

## MORTGAGE
### (Continued)

Page 16

### INDIVIDUAL ACKNOWLEDGMENT

State of New Jersey

~~COMMONWEALTH OF PENNSYLVANIA~~                    )
                                                   ) SS
COUNTY OF ____Camden._____              )

On this, the ___2ᵗⁿ___ day of ___February___, 20 _11_, before me ___Michelle Post___, the undersigned Notary Public, personally appeared Jamie Haas (aka Jamie M Haas), known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he or she executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

MICHELLE ABBOTT
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 2/24/2013

Notary Public in and for the State of ___New Jersey___

LASER PRO Lending, Ver. 5.55.00.002  Copr. Harland Financial Solutions, Inc. 1997, 2011.
All Rights Reserved.  - PA/NJ

# TITLE INSURANCE COMMITMENT

*Issued by* **Park Avenue Abstract**

## AGENT FOR COMMONWEALTH LAND TITLE INSURANCE COMPANY

Commitment Number: ▮▮▮▮▮

### SCHEDULE C

### LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, described according to a Survey and Plan thereof made by John H. Webster, Jr., Surveyor and Regulator of the Tenth Survey District on November 25, A.D. 1912, as follows, to wit:

SITUATE on the Southeast side of Richmond Street at the distance of Fifteen feet Southwestwardly from the Southwest side of Plum Street in the 45th Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Richmond Street, Fifteen feet and extending of that width in length or depth Southeastwardly between lines parallel with said Plum Street, on the Northeast line thereof Seventy-seven feet One and one-eighth inches and on the Southwest line thereof Seventy-seven feet two and seven-eighths inches to a certain three feet four inches wide alley which extends Northeastwardly into said Plum Street.

BEING No. 4419 Richmond Street.

TOGETHER with the free and common use, right, liberty and privilege of the above mentioned three feet four inches wide alley as and for a passageway and watercourse at all times hereafter, forever, in common with the others having a right thereto.

Southwest line thereof Seventy-seven feet two and seven-eighths inches to a certain three feet four inches wide alley which extends Northeastwardly into said Plum Street.

BEING No. 4419 Richmond Street.

BEING PHILADELPHIA COUNTY TAX PARCEL NUMBER ███████.

TOGETHER with the free and common use, right, liberty and privilege of the above mentioned three feet four inches wide alley as and for a passageway and watercourse at all times hereafter, forever, in common with the others having a right thereto.

BEING the same premises which EMC Mortgage Corporation, by Indenture bearing date the 11th day of August A.D. 2004 and recorded at Philadelphia in the Office for the Recording of Deeds, in and for the County of Philadelphia on the 25th day of August A.D. 2004 in Document No. ███████, granted and conveyed unto Longshore Investments, Inc., a Pennsylvania Corporation, in fee.

2

MAY 21 2007 16:47 FR

No.___ CORPORATION DEED          Printed and Sold by John C. Clark Co., 1326 Walnut St. Phila.

# This Indenture Made the *two*

day of *December*          in the year of our Lord two thousand
four (2004

## Between

LONGSHORE INVESTMENTS, INC., A PENNSYLVANIA CORPORATION

(hereinafter called the Grantor    ), of the one part, and

JANIE M. HAAS

(hereinafter called the Grantee    ), of the other part,

Witnesseth,          That the said  Grantor

for and in consideration of the sum of

EIGHTY-FIVE THOUSAND DOLLARS.......................00/100($85000.00)

lawful
money of the United States of America, unto       it       well and truly paid by the said Grantee    ,
at or before the sealing and delivery, hereof, the receipt whereof is hereby acknowledged,     has
granted, bargained and sold, aliened, enfeoffed, released and confirmed, and by these presents     does
grant, bargain and sell, alien, enfeoff, release and confirm unto the said Grantee    ,     her
heirs       and assigns.

ALL THAT CERTAIN lot or piece of ground with the buildings and
improvements thereon erected, described according to a Survey and Plan
thereof made by John E. Webster, Jr., Surveyor and Regulator of the
Tenth Survey District on November 25, A.D. 1912, as follows, to wit:

SITUATE on the Southeast side of Richmond Street at the distance of
Fifteen feet Southwestwardly from the Southwest side of Plum Street
in the 45th Ward of the City of Philadelphia.

CONTAINING in front or breadth on the said Richmond Street, Fifteen
feet and extending of that width in length or depth Southeastwardly
between lines parallel with said Plum Street, on the Northeast line
thereof Seventy-seven feet One and one-eighth inches and on the

Page: 1 of 5
01/27/2005 12:06PM

17

3

Prepared By:

Return To:
Fulton Bank
4429 Bonney Road, Suite 310
Virginia Beach, VA 23462
Attn: Post Closing

Parcel Number:

Premises:
4419 RICHMOND STREET
PHILADELPHIA, PA 19137

——————————— [Space Above This Line For Recording Data] ———————————

Commonwealth of Pennsylvania

# MORTGAGE

FHA Case No.

MIN

THIS MORTGAGE ("Security Instrument") is given on May 18, 2009
The Mortgagor is JAMIE M. HAAS

("Borrower"). This Security Instrument is given to Mortgage Electronic Registration Systems, Inc.
("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns), as
mortgagee. MERS is organized and existing under the laws of Delaware, and MERS has a mailing address
of P.O. Box 2026, Flint, MI 48501-2026 and a street address of 3300 S.W. 34th Avenue, Suite 101,
Ocala, FL 34474. The MERS telephone number is                   THE BANK

("Lender") is organized and existing under the laws of STATE OF NEW JERSEY                   , and

FHA Mortgage with MERS - PA
VMP®
Wolters Kluwer Financial Services

Initials:

Page 1 of 11

Page: 1 of 12
06/12/2009 09:50AM

This Document Recorded
06/12/2009
09:50AM
Doc Code: M

Doc Id:
Receipt #:
Rec Fee: 126.50
Commissioner of Records, City of Philadelphia

has an address of 100 PARK AVENUE, WOODBURY, NJ  08096

Borrower owes Lender the principal sum of One Hundred Seventeen Thousand Twelve And Zero/100                                    Dollars (U.S. $117,012.00            ). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on June 01, 2039            . This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in PHILADELPHIA County, Pennsylvania:

   BEING the same premises more fully described in Exhibit "A"
   attached and made a part hereof.

which has the address of 4419 RICHMOND STREET                          [Street]
PHILADELPHIA                       [City], Pennsylvania 19137            [Zip Code]
("Property Address");

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for

FHA Mortgage with MERS - PA
VMP®
Wolters Kluwer Financial Services                    Initials: _____    Page 2 of 11

## CREDIT AGREEMENT AND DISCLOSURE  (OPTIONLINE)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $10,000.00 | 10-15-2010 | | | | | | |

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * * *" has been omitted due to text length limitations.

**Borrower:** Jamie Haas
4419 Richmond Street
Philadelphia, PA  19137

**Lender:** The Bank
Voorhees Office
533 Fellowship Road
Mount Laurel, NJ  08054

**INDEX.** The following index is for convenience purposes only and is not to be used to interpret or to define any provisions of this Agreement.

1.  Introduction
2.  Promise to Pay
3.  Term
4.  Minimum Payment
5.  How Your Payments Are Applied
6.  Receipt of Payments
7.  Credit Limit
8.  Charges to your Credit Line
9.  Credit Advances
    (A)  Credit Line Checks
    (B)  Telephone Request
    (C)  Overdrafts
    (D)  Requests in Person
    (E)  Internet Online Banking
10. Limitations on the Use of Checks
    (A)  Credit Limit Violation
    (B)  Post-dated Checks
    (C)  Stolen Checks
    (D)  Unauthorized Signatures
    (E)  Termination or Suspension
    (F)  Transaction Violation
11. Transaction Requirements
    (A)  Credit Line Line of Credit Check, In Person Request, Internet Online Banking, Telephone Request and Overdraft Limitations
         (1)  Minimum Advance Amount
         (2)  Other Transaction Requirements
12. Limitation on All Access Devices
13. Authorized Signers
14. Lost Line of Credit Checks
15. Future Credit Line Services
16. Collateral
17. Insurance
18. Right of Setoff
19. Periodic Statements
20. When FINANCE CHARGES Begin to Accrue
21. Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed
22. Method of Determining the Amount of FINANCE CHARGE
23. Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE
24. Preferred Rate Reduction
25. Conversion Option
    (A)  ANNUAL PERCENTAGE RATE Increase
    (B)  Conversion Periods
    (C)  Conversion Fees
    (D)  Rate Determination
    (E)  Conversion Rules
26. Conditions Under Which Other Charges May Be Imposed
    (A)  Overlimit Charge
    (B)  Late Charge
    (C)  Lien Release Fees
    (D)  Security Interest Charges
27. Lender's Rights
    (A)  Termination and Acceleration
    (B)  Suspension or Reduction
    (C)  Change in Terms
    (D)  Collection Costs
28. Access Devices
29. Delay in Enforcement
30. Cancellation by you
31. Prepayment
32. Notices
33. Credit Information and Related Matters

Case 18-11474-amc    Doc 37-2    Filed 08/30/18    Entered 08/30/18 11:23:44    Desc
CREDIT AGREEMENT AND DISCLOSURE   Page 29 of 43
(OPTIONLINE)
(Continued)                                                    Page 2

Loan No: _____

34.  Transfer or Assignment
35.  Tax Consequences
36.  Jury Waiver
37.  ARBITRATION
38.  Governing Law
39.  Choice of Venue
40.  Caption Headings
41.  Interpretation
42.  Severability
43.  Acknowledgment

**CREDIT LIMIT: $10,000.00**                    DATE OF AGREEMENT: October 15, 2010

NOTICE. THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION. IN THE NEXT 30 DAYS, YOU CAN ELECT TO REJECT THE ARBITRATION PROVISION. UNLESS YOU DO SO, THE ARBITRATION PROVISION WILL HAVE A SUBSTANTIAL IMPACT ON HOW ANY LEGAL CLAIMS WE HAVE AGAINST EACH OTHER ARE RESOLVED.

1. Introduction. This Credit Agreement and Disclosure (OPTIONLINE) ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through The Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean The Bank. You agree to the following terms and conditions:

2. Promise to Pay. You promise to pay The Bank, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

3. Term. The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until termination of your Credit Line Account. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon termination. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of New Jersey, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: for a period of four years from the Opening Date, which at the Lender's discretion, may be extended for one or more additional four-year periods. You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: for a period of five years.

4. Minimum Payment. Your "Regular Payment" will equal the amount of your accrued FINANCE CHARGES or $50.00, whichever is greater ("First Payment Stream"). You will make 48 of these payments. Your payments will be due monthly. Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment.

After completion of the First Payment Stream, your "Regular Payment" will be based on a percentage of your balance at the start of this payment period plus all accrued FINANCE CHARGES as shown below or $50.00, whichever is greater ("Second Payment Stream"). Your payments will be due monthly.

| Range of Balances | Regular Payment Calculation |
|---|---|
| All Balances | 1.667% of your balance at the start of the repayment period plus all accrued FINANCE CHARGES |

Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

5. How Your Payments Are Applied. Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to any voluntary credit life and disability insurance premiums; then to Finance Charges; then to unpaid principal; then to late charges and other charges; and then to any amounts that exceed your Credit Limit.

6. Receipt of Payments. Mailed loan payments must be sent to the bank to the address shown on the front of this agreement and must include the account number or payment coupon. Payments must be received by mail, via transfer from a bank deposit account, or in person to bank personnel at any of our branch locations Monday through Friday (excluding holidays) during our normal business hours up through 5:00 p.m. EST to be credited as of that date. Payments made after 5:00 p.m. or on Saturdays, Sundays or holidays may not be credited until the following business day.

7. Credit Limit. This Agreement covers a revolving line of credit for the principal amount of Ten Thousand & 00/100 Dollars ($10,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit

Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**8. Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**9. Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

(A) **Credit Line Checks.** Writing a preprinted "Line of Credit Check" that we will supply to you.

(B) **Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, **you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.**

(C) **Overdrafts.** Writing a check on your designated checking account with us in excess of the available collected balance in the account.

(D) **Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

(E) **Internet Online Banking.** Accessing your account through Internet Online Banking.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**10. Limitations on the Use of Checks.** We reserve the right not to honor Line of Credit Checks in the following circumstances:

(A) **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Line of Credit Check.

(B) **Post-dated Checks.** Your Line of Credit Check is post-dated. If a post-dated Line of Credit Check is paid and as a result any other check is returned or not paid, we are not responsible.

(C) **Stolen Checks.** Your Line of Credit Checks have been reported lost or stolen.

(D) **Unauthorized Signatures.** Your Line of Credit Check is not signed by an "Authorized Signer" as defined below.

(E) **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Line of Credit Check.

(F) **Transaction Violation.** Your Line of Credit Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Line of Credit Check.

If we pay any Line of Credit Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Line of Credit Check. The Line of Credit Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Line of Credit Checks along with your periodic billing statements; however, your use of each Line of Credit Check will be reflected on your periodic statement as a credit advance. We do not "certify" Line of Credit Checks drawn on your Credit Line.

**11. Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

(A) **Credit Line Line of Credit Check, In Person Request, Internet Online Banking, Telephone Request and Overdraft Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Line of Credit Checks, requesting an advance in person, accessing by other methods, requesting an advance by telephone and writing a check in excess of your checking account balance.

(1) **Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $100.00. This means any Line of Credit Check must be written for at least the minimum advance amount.

(2) **Other Transaction Requirements.** To obtain advances through Overdraft Protection of a Checking Account with Lender, a separate Rider must be completed.

**12. Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**13. Authorized Signers.** The words "Authorized Signer" on Line of Credit Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has

executed a separate signature authorization card for the Credit Line Account.

**14. Lost Line of Credit Checks.** If you lose your Line of Credit Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at You also can notify us at Lost Credit Line Access Device Notification 533 Fellowship Road, Mount Laurel, NJ 08054.

**15. Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**16. Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: an Open-End Mortgage dated October 15, 2010, to us on real property located in Philadelphia County, Commonwealth of Pennsylvania.

**17. Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**18. Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account). This includes, without limitation, all accounts you hold jointly with someone else and all accounts you may open in the future. This does not include however any IRA, Keogh, or trust accounts. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts, and, at our option, to administratively freeze all such accounts to allow us to protect our charge and setoff rights provided in this paragraph.

**19. Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, **FINANCE CHARGES,** other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**20. When FINANCE CHARGES Begin to Accrue.** Periodic **FINANCE CHARGES** for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Credit Line credit advances.

**21. Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily **FINANCE CHARGE** will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "average daily balance method". To get the average daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid **FINANCE CHARGES**. This gives us a daily balance. Then we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "average daily balance."

If more than one daily periodic rate is in effect during a billing cycle, we compute the finance charge by (1) multiplying the average daily balance for the portion of the billing cycle each daily periodic rate was in effect by the number of days the applicable periodic rate was in effect, (2) multiplying each of the results by the applicable daily periodic rate, and (3) adding these products together.

**22. Method of Determining the Amount of FINANCE CHARGE.** Any **FINANCE CHARGE** is determined by applying the "Periodic Rate" to the balance described herein. This is your **FINANCE CHARGE** calculated by applying a Periodic Rate.

**23. Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index which is the Wall Street Journal U. S. Prime, this is the base rate on corporate loans posted by at least 75% of the nation's largest banks (the "Index"). We will use the most recent Index value available to us as of the date of an increase or decrease in the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE**. The next periodic statement we send you will reflect any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your account, we add a margin to the value of the Index, subtract any preferred rate reductions in effect as specified below, then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your First Payment Stream. To determine the Periodic Rate that will apply to your account, we add a margin to the value of the Index, subtract any preferred rate reductions in effect as specified below, then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your Second Payment Stream. The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

Subject to the termination of any preferred rate reduction described below, the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect daily. In no event will the Periodic Rate result in a corresponding **ANNUAL PERCENTAGE RATE** that is less than 5.990% or more than 30.000%, nor will the Periodic Rate or corresponding **ANNUAL PERCENTAGE RATE** exceed the maximum rate allowed by applicable law. Today the Index is 3.250% a year, and therefore the

Case 18-11474-amc   Doc 37-2   Filed 08/30/18   Entered 08/30/18 11:23:44   Desc
Exhibit A   Page 32 of 43
Loan No: [redacted]
CREDIT AGREEMENT AND DISCLOSURE (OPTION LINE)
(Continued)
Page 5

initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line are as stated below:

### Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 3.500% | 5.990% | 0.01641% |

### Current Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 3.500% | 5.990% | 0.01641% |

**24. Preferred Rate Reduction.** The **ANNUAL PERCENTAGE RATE** under this Credit Line Account includes a preferred rate reduction. If the preferred rate reduction is terminated, the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** may increase. The preferred rate reduction is subject to the following provisions:

**Reduction Percentage: 1.000%**
**Description of Event That Would Cause the Preferred Rate Reduction to Terminate.**
A .50% preferred rate reduction terminates immediately upon termination of Borrower's employment with Fulton Financial Corporation or its subsidiaries. In addition, a .50% preferred rate reduction terminates if: (i) Borrower's election to deduct payments from Borrower's Deposit Account is revoked; (ii) Borrower's Deposit Account does not have sufficient funds to make a payment; or (iii) Borrower or Lender, for any reason, close Borrower's Deposit Account.
**How The New Rate Will Be Determined Upon Termination of the Preferred Rate Reduction.**
The Margin Added to the Index, as stated above, does not include the combined preferred rate reduction of 1.000%, which is the result of the Borrower's qualification for two separate .50% preferred rate reductions outlined above. If either .50% preferred rate reduction is terminated, only the Margin Added to the Index, as stated above, plus the Index, minus the remaining .50% preferred rate reduction will be used to determine the Periodic Rate, provided that this new Periodic Rate and corresponding ANNUAL PERCENTAGE RATE is higher than the Minimum ANNUAL PERCENTAGE RATE for the remaining term of your Credit Line Account. If both .50% preferred rate reductions are terminated, only the Margin Added to the Index, as stated above, plus the Index will be used to determine the Periodic Rate, provided that this new Periodic Rate and corresponding ANNUAL PERCENTAGE RATE is higher than the Minimum ANNUAL PERCENTAGE RATE for the remaining term of your Credit Line Account. An increase in the Periodic Rate may increase the amount of your Regular Payment.

**Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.**

**25. Conversion Option.** Your Credit Line Account includes an option to convert a portion or all of the balance under your Credit Line from a variable ANNUAL PERCENTAGE RATE to a fixed ANNUAL PERCENTAGE RATE as determined below. Each portion of the balance under your Credit Line you convert to a fixed ANNUAL PERCENTAGE RATE is referred to as a "Fixed-Rate Advance." The following information describes the terms of the conversion option available under your Credit Line Account:

**(A) ANNUAL PERCENTAGE RATE Increase.** Your **ANNUAL PERCENTAGE RATE** may increase if you exercise this option to convert to a fixed rate.

**(B) Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods: You can exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE at any time during the Draw Period, and any extension of the Draw Period. After the Draw Period ends, or if you do not meet the repayment terms of this Credit Agreement, you will not be able to exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE.

**(C) Conversion Fees.** You will be required to pay the following fees at the time of conversion to a fixed rate: a rate lock fee of $100.00 each time you exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE.

**(D) Rate Determination.** The fixed rate will be determined as follows: See attached Conversion Option Rate Determination Rider.

**(E) Conversion Rules.** You can convert to a fixed rate only during the period or periods described above. In addition, the following rules apply to the conversion option under this Agreement: You can exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE only during the period or periods described above. In addition, the following rules apply to the exercise of the option to convert to a fixed ANNUAL PERCENTAGE RATE under your Credit Line Account:

**(a) Minimum and Maximum Term.** If you exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE, the term of the Fixed-Rate Advance can not be less than six (6) months or longer than one hundred eighty (180) months.

**(b) Number of Fixed-Rate Advances.** You can exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE from time to time, but you may not have more than three (3) different Fixed-Rate Advances outstanding under your Credit Line Account at any one time.

**(c) Ineligible for Promotional Rates.** In determining your interest rate and ANNUAL PERCENTAGE RATE as described in the Rate Determination paragraph above, our published closed-end home equity loan interest rates and ANNUAL PERCENTAGE RATE will not include any special, promotional or coupon interest rates and interest

rates available only for newly opened accounts. If we offer a discounted interest rate and ANNUAL PERCENTAGE RATE for agreeing to make payments through automatic deduction from a checking account maintained with us, that discounted rate will be considered the published rate for purposes of the Rate Determination paragraph above, regardless of whether you have agreed to have payments under your Credit Line Account automatically deducted from a checking account you maintain with us.

**(d) Complete Election Form.** In order to exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE, you must sign and return to us a Fixed-Rate Advance Election Form. The Fixed-Rate Advance Election Form will set forth the principal amount, interest rate, ANNUAL PERCENTAGE RATE, term (in months), the number of monthly payments and the amount of each payment applicable to the Fixed-Rate Advance.

**(e) Minimum Monthly Payments.** At the time you exercise the option to convert to a fixed ANNUAL PERCENTAGE RATE, we will determine a minimum monthly payment applicable to that Fixed-Rate Advance. The minimum monthly payment will include both principal and interest and will be sufficient to repay the Fixed-Rate Advance in equal monthly installments of principal and interest over the term of the Fixed-Rate Advance. The minimum monthly payment with respect to a Fixed-Rate Advance will not be less than $50. If you have more than one Fixed-Rate Advance outstanding, you will have to make minimum monthly payments with respect to each Fixed-Rate Advance. The minimum monthly payments due with respect to Fixed-Rate Advances will be in addition to the Minimum Payment due with respect to any balance under your Credit Line subject to a variable ANNUAL PERCENTAGE RATE.

**(f) How Payments Are Applied if You have a Fixed Rate Advance Outstanding.** Payments or other credits will be applied first to any voluntary credit life and disability insurance premiums; then to any Finance Charges related to the principal outstanding subject to a variable ANNUAL PERCENTAGE RATE; then to Finance Charges related to Fixed-Rate Advances, in ascending account number order (earliest Fixed-Rate Advance first); then to the principal due, if any, related to the principal outstanding subject to a variable ANNUAL PERCENTAGE RATE; then to principal due related to Fixed-Rate Advances, in ascending account number order; then to late charges and other charges; and then to any amounts that exceed the maximum amount of your Credit Line. In the event you make a payment in excess of the amount necessary to pay all of these amounts, the excess will be first applied to reduce any principal outstanding subject to a variable ANNUAL PERCENTAGE RATE, and then to principal outstanding related to Fixed-Rate Advances, in ascending account number order. Any prepayments of principal will not reduce the amount of, or extend the due date for, any future minimum monthly payments.

**26. Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**(A) Overlimit Charge.** Your Credit Line Account may be charged $25.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Line of Credit Check in excess of your available balance.

**(B) Late Charge.** Your payment will be late if it is not received by us within 15 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the unpaid amount of the payment.

**(C) Lien Release Fees.** In addition to all other charges, you agree, to the extent not prohibited by law, to pay all governmental fees for release of our security interests in collateral securing your Credit Line. You will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $60.00.

**(D) Security Interest Charges.** You agree to pay all security interest charges related to your Credit Line as set forth below:

| | |
|---|---|
| Est. Future Lien Release Fee | $60.00 |
| Recording Fee | $170.00 |
| Total | $230.00 |

**27. Lender's Rights.** Under this Agreement, we have the following rights:

**(A) Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**(B) Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and

perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**(C) Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**(D) Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our reasonable attorneys' fees and our legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**28. Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Line of Credit Checks and any other access devices. Any use of Line of Credit Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Line of Credit Checks or other Credit Line access devices not returned to us.

**29. Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**30. Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address and return all Line of Credit Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**31. Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: The Bank, P.O. Box 130 Woodbury, NJ 08096.

**32. Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**33. Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**34. Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**35. Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the

specific inaccuracy(ies) should be sent to us at the following address: The Bank Loan Operations P.O. Box 25091 Lehigh Valley, PA 18002-5091.

**36. Jury Waiver.** We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**37. ARBITRATION.** As set forth below, any legal disputes between you and us may be subject to binding arbitration unless you elect in the next 30 days to reject this Arbitration Provision. For a Claim subject to arbitration, neither you nor we will have the right to: (1) have a court or a jury decide the Claim; (2) engage in information-gathering (discovery) to the same extent as in court; (3) participate in a class action or private attorney general action in court or in arbitration; or (4) join or consolidate Claim(s) affecting you with claims affecting any other person. The right to appeal is more limited in arbitration than in court and other rights in court may be unavailable or limited in arbitration.

**Definitions.** As used in this Provision:

"You" and "your" mean each person who signs this Agreement as Borrower.

"We", "us" and "our" mean: (1) The Bank (the "Bank"); (2) any person(s) to whom the Credit is transferred or assigned; (3) any Covered Provider; (4) the parents, subsidiaries and affiliates of the companies in (1)-(3) above; (5) the successors and predecessors of the companies in (1)-(4) above; and (6) the officers, directors and employees of the companies in (1)-(5) above.

"Covered Provider" means any third party that provides any product or service in connection with the Credit if (and only if) such third party is named as a co-party with us in a Claim asserted by you. "Covered Provider" may include, without limitation, mortgage, loan and real estate brokers; appraisers; credit bureaus; insurance agents, brokers and underwriters; escrow and closing agents; attorneys; loan servicers; and debt collectors.

"Credit" means the Credit Line under this Agreement and each advance under the Credit Line.

"Claim" means any claim, dispute or controversy between you and us, other than any Excluded Claim or Proceeding, arising from or relating in any way to the Credit. Without limiting the above definition, "Claims" can relate to: (1) the Agreement (including this Provision) or any related document; (2) Credit rates, fees and terms; (3) insurance or other services or products offered or made available to you in connection with the Credit; (4) any related advertising, information or statements; (5) any related negotiations; (6) any property securing the Credit; (7) the origination, closing, servicing, collection or enforcement of the Credit; and (8) any claim based on our improper receipt, disclosure or failure to protect any information about you. The term "Claim" is to be given the broadest possible meaning, and includes claims of every kind and nature, including but not limited to initial and amended claims, counterclaims, cross-claims and third-party claims. "Claims" can be based upon any legal theory, including contract, tort (including misrepresentation or fraud), statute, regulation or otherwise. The term "Claim" includes pre-existing, present or future claims. "Claims" can seek relief of any type, including damages and/or injunctive, declaratory or other equitable relief. A party does not waive the right to require arbitration of a new Claim by bringing a Claim in a lawsuit or failing to require arbitration of another Claim. Notwithstanding the broad definition of "Claim" set forth above, a "Claim" shall not include any self-help or non-judicial remedy, including but not limited to acceleration of the Credit, non-judicial foreclosure, self-help repossession and/or set-off; and shall not include any individual judicial action by a party that is limited to preventing the other party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief of any kind.

"Excluded Claim or Proceeding" means any of the following claims or proceedings, which will not be subject to this Provision: (1) any individual action brought by you in small claims court or your state's equivalent court, unless such action is transferred, removed, or appealed to a different court; (2) any action to effect a judicial or quasi-judicial foreclosure; (3) any eviction or other summary proceeding to secure possession of real property securing a Credit; (4) any action to assert, collect, protect, realize upon or obtain possession of the collateral for a Credit in any bankruptcy proceeding; (5) any action to quiet title; (6) any action to the extent that it seeks provisional or ancillary remedies in connection with any of the foregoing; (7) any individual action to prohibit any of the foregoing so long as it does not involve a request for damages or monetary relief of any kind; and (8) any dispute concerning the validity and effect of the subsection below captioned "No Class Actions, Etc." Notwithstanding the prior sentence, at your request we will agree to arbitrate under this Provision any matter covered by items (2)-(7) above if we conclude or a court finally determines that arbitration will afford you and us substantially the same substantive rights and remedies as a court proceeding. If we are allowed to proceed in court with respect to any of the matters covered by items (2)-(7) above, you may assert in court or in a separate arbitration any defenses you may have to our Claims, but any Claim for rescission or monetary relief you may have remains subject to arbitration at our election. In the event you assert in arbitration a defense to an Excluded Claim or Proceeding, we agree to stay our pursuit of such Excluded Claim or Proceeding until the arbitration award becomes final.

"Administrator" means the National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405, www.arb-forum.com, ▮▮▮▮▮; or the American Arbitration Association, 335 Madison Avenue, New York, NY 10017, www.adr.org, as selected in accordance with this Provision. However, if both the NAF and AAA are unable to serve, the parties may agree upon another Administrator or, if they are unable to agree, a court shall determine the Administrator.

"Notice Address" means the address that must be used for giving all notices under this Provision (other than notices given in lawsuits, which may be given in accordance with the rules of the court). The Notice Address for you is the latest address we have in our files. The Notice Address for us is The Bank, Attn: Scanning, P.O. Box 25091, Lehigh Valley, PA  18002-5091, although we may give you notice at any time that we have changed our Notice Address.

**Starting An Arbitration.** To start an arbitration, you or we must give written notice of an election to arbitrate. This notice may be given after a lawsuit has been filed and may be given in papers filed in the lawsuit. If such a notice is given, the Claim(s) described in the notice shall be resolved by arbitration under this Provision and, to the extent consistent with this Provision, the applicable rules of the Administrator then in effect. If you elect to arbitrate a Claim, you can choose the Administrator in your notice. If we elect to arbitrate a Claim, you can choose the Administrator by giving us written notice of your selection within 20 days after the date of our notice. If you do not timely choose the Administrator, we will do so. The arbitrator will be selected under the Administrator's rules, except that the arbitrator must be a lawyer with at least ten years of experience or a retired judge unless the parties

agree otherwise. Any party who wrongfully fails to comply with this Provision shall be liable to the other party for all reasonable costs, including attorneys' fees, incurred in enforcing this Provision.

**Location And Costs.** Any arbitration hearing that you attend will take place in a location that is reasonably convenient for you. So long as you act in good faith, we will bear any arbitration filing, administrative, hearing and similar fees which you are required to pay to pursue a Claim (whether the fees are incurred in the initial arbitration proceeding or in an appeal to a panel of arbitrators), to the extent that you would not be required to bear such fees in court. We will also bear all amounts we are required to bear under applicable law or that we must pay in order for this Provision to be enforced. Subject to the last sentence of the subsection captioned "Starting An Arbitration," each party must pay for its own attorneys, experts and witnesses, regardless of who wins the arbitration, except where applicable law and/or the Administrator's rules provide otherwise.

**Governing Law; Obtaining Information (Discovery).** This Agreement involves interstate commerce and this Provision is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"), and not federal or state rules of civil procedure or evidence or any state laws that pertain specifically to arbitration. The arbitrator shall be obligated to follow applicable substantive laws, statutes of limitation and privilege rules related to any Claim. The arbitrator shall award the remedies, if any, that would be available in an individual court proceeding if arbitration had not been elected. This includes, without limitation, compensatory, statutory and punitive damages (which shall be governed by the constitutional standards applicable in judicial proceedings); declaratory, injunctive and other equitable relief; and attorneys' fees and costs. Upon the timely request of either party, the arbitrator shall write a brief explanation of the grounds for his or her decision. In addition to the parties' rights under the Administrator's rules to obtain information prior to the hearing, either party may ask the arbitrator for more information from the other party. The arbitrator will decide the issue in his or her sole discretion, after allowing the other party the opportunity to object.

**No Class Actions, Etc.** Notwithstanding any other provision in this Provision to the contrary, if you or we elect to arbitrate a Claim, neither you nor we will have the right: (a) to participate in a class action or private attorney general action in court or in arbitration, whether as a class representative, class member, class opponent, private attorney general or otherwise; or (b) to join or consolidate Claims with claims of any person other than you. No arbitrator shall have authority to conduct any arbitration in violation of this provision.

**Effect Of Arbitration Award.** Any court with jurisdiction may enter judgment upon the arbitrator's award. The arbitrator's award will be final and binding, except for: (1) any appeal right under the FAA; and (2) Claims involving more than $50,000. For Claims involving more than $50,000, any party may appeal the award (regardless of the amount) to a three-arbitrator panel appointed by the Administrator, which will reconsider de novo any aspect of the initial award that is appealed. The panel's decision will be final and binding, except for any appeal right under the FAA.

**Continued Effect Of Arbitration Provision; Severability; Conflicts.** This Provision shall survive (1) any modification of this Agreement or any extension or forbearance under this Agreement; (2) your full repayment of the Credit; (3) our sale or transfer of the Credit; (4) any foreclosure or other legal proceeding by us to collect the Credit; (5) the transfer of any property securing the Credit; (6) any bankruptcy (except where prohibited by bankruptcy law); and (7) any rescission by you or attempt by you to rescind the Credit pursuant to any applicable law. If any portion of this Provision (other than the subsection captioned "No Class Actions, Etc.") cannot be enforced, the rest of this Provision will continue to apply. However, if the subsection captioned "No Class Actions, Etc." is held invalid, subject to the right to appeal such holding, the entire Provision (except this sentence) shall be null and void with respect to such proceeding.

**Rejection Of Arbitration Provision. This Provision will apply unless you cancel it within 30 days after the Date of Agreement above. Cancellation of this Provision will not affect the terms of any Credit you are receiving or have received or result in any penalty or other adverse consequence. To cancel this Provision, you must send us a written notice, signed by you (by each of you, if more than one person is liable to repay the Credit). The notice must be mailed or faxed within 30 days after the date of this Provision to the Notice Address, and must state that you want to cancel your Arbitration Provision. You cannot cancel this Provision in any other way, and nobody else can cancel this Provision for you unless such other person includes a signed power of attorney from you with the cancellation notice. Our business records will be final and conclusive with respect to whether you properly cancelled this Provision in a timely fashion.**

**38. Governing Law. This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of New Jersey.**

**39. Choice of Venue.** If there is a lawsuit, you agree upon our request to submit to the jurisdiction of the courts of Camden County, State of New Jersey.

**40. Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**41. Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**42. Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**43. Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed

| Loan No: | (Continued) | Page 10 |

copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

**BORROWER:**

X _____
Jar~~ih~~ Haas

Effective Disbursement Date: ___10 | 15 | 10___

# BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### Notify us in case of errors or questions about your bill.

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> **The Bank**
> **533 Fellowship Road**
> **Mount Laurel, NJ 08054**

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

> Your name and account number.

> The dollar amount of the suspected error.

> Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

### Your rights and our responsibilities after we receive your written notice.

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LASER PRO Lending, Ver 5.53.10.003 Copr. Harland Financial Solutions, Inc. 1997, 2010  All Rights Reserved

## RATE DETERMINATION RIDER - OPTIONLINE - PRIMARY RESIDENCE - TIER 2
## (STANDARD)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $10,000.00 | 10-15-2010 | | | | | | |

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Jamie Haas | Lender: | The Bank |
|---|---|---|---|
| | 4419 Richmond Street | | Voorhees Office |
| | Philadelphia, PA 19137 | | 533 Fellowship Road |
| | | | Mount Laurel, NJ 08054 |

This RATE DETERMINATION RIDER - OPTIONLINE - PRIMARY RESIDENCE - TIER 2 (STANDARD) is attached to and by this reference is made a part of the Credit Agreement and Disclosure (OPTIONLINE), dated October 15, 2010, and executed in connection with a loan or other financial accommodations between THE BANK and Jamie Haas.

Rate Determination. The fixed ANNUAL PERCENTAGE RATE will be determined as follows: the fixed ANNUAL PERCENTAGE RATE will be the lesser of: (i) if we publish fixed rates for our closed-end primary residence home equity loans at the time you request a Fixed Rate Advance and for the term of your Fixed Rate Advance, our published Tier 2 (Standard) closed-end primary residence home equity loan interest rate and ANNUAL PERCENTAGE RATE for the same fixed rate term; or (ii) the Index plus 12.00%. Our published rates are those closed-end primary residence home equity loan interest rates from time to time posted in our branch offices, on our web site or in other media, so long as the interest rate content is within our control. We shall have no obligation to offer or publish fixed rates for our closed-end primary residence home equity loans. In the event we do not offer or publish fixed rates for our closed-end primary residence home equity loans, or do not offer or publish such rates for the term of your Fixed Rate Advance, the fixed ANNUAL PERCENTAGE RATE will be determined solely by adding 12.00% to the Index. From time to time, we may publish two or more interest rates and ANNUAL PERCENTAGE RATES for closed-end primary residence home equity loans with the same fixed rate term for Tier 2 (Standard), which differ only in the permitted maximum ratio of the total of all loans secured by your residence (including the Credit Limit of your Credit Line) to the appraised value of your residence (this ratio is referred to as the "Loan-to-Value Ratio"). If we publish more than one interest rate for a given term based on the maximum Loan-to-Value Ratio for Tier 2 (Standard), our published rates for purposes of the conversion option will be the published interest rate and ANNUAL PERCENTAGE RATE which corresponds to the Loan-to-Value Ratio we determined for your Credit Line as of the Opening Date of your Credit Line. The Loan-to-Value Ratio we determined for your Credit Line as of the Opening Date of your Credit Line is 88.88%. If the value of the Index is at any time less than the minimum ANNUAL PERCENTAGE RATE applicable to your Credit Line Account, for purposes of this Rate Determination paragraph, the value of the Index shall be the minimum ANNUAL PERCENTAGE RATE applicable to your Credit Line Account during any such period that the value of the Index is below the minimum ANNUAL PERCENTAGE RATE applicable to your Credit Line Account.

THIS RATE DETERMINATION RIDER - OPTIONLINE - PRIMARY RESIDENCE - TIER 2 (STANDARD) IS EXECUTED ON OCTOBER 15, 2010.

BORROWER:

_____
Jamie Haas

LASER PRO Lending, Ver. 5.53.10.003  Copr. Harland Financial Solutions, Inc. 1997, 2010.  All Rights Reserved.

## DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $10,000.00 | 10-15-2010 | | | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Jamie Haas
4419 Richmond Street
Philadelphia, PA  19137

**Lender:** The Bank
Voorhees Office
533 Fellowship Road
Mount Laurel, NJ  08054

**LOAN TYPE.** This is a Variable Rate with Preferred Rate Reduction Disclosable Open-end Line of Credit Loan to an Individual with a Credit Limit of $10,000.00.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☒ **Personal, Family or Household Purposes.**

☐ **Personal Investment.**

☐ **Acquire Equipment for Business or Commercial Purposes.**

☐ **Business, Agricultural and All Other.**

**SPECIFIC PURPOSE.** The specific purpose of this loan is:  Debt Consolidation.

**REAL ESTATE DOCUMENTS.** If any party to this transaction is granting a security interest in any real property to Lender and Jamie Haas am not also a party to the real estate document or documents (the "Real Estate Documents") granting such security interest, I agree to perform and comply with the Real Estate Documents just as if I have signed as a direct and original party to the Real Estate Documents.  This means I agree to all the representations and warranties made in the Real Estate Documents.  In addition, I agree to perform and comply strictly with all the terms, obligations and covenants to be performed by either me or any Grantor or Trustor, or both, as those words are defined in the Real Estate Documents.  Lender need not tell me about any action or inaction Lender takes in connection with the Real Estate Documents.  I assume the responsibility for being and keeping informed about the property.  I also waive any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the property, or any delay by Lender in realizing upon the property.

**DISBURSEMENT INSTRUCTIONS.** I understand that no loan proceeds will be disbursed until any notice of the right to cancel time period specified has expired and all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $10,000.00 as follows:

| | |
|---|---|
| **Undisbursed Funds:** | $2,502.57 |
| **Amount paid to others on my behalf:** | $7,497.43 |
| $5,063.64 to Target N B. | |
| $1,184.98 to GEMB/JCP | |
| $1,037.95 to BRCLYSBANKDE | |
| $210.86 to HSBC/BOSCOV | |
| | |
| **Credit Limit:** | $10,000.00 |

## DISBURSEMENT REQUEST AND AUTHORIZATION

**CHARGES PAID IN CASH.** I have paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| Prepaid Finance Charges Paid in Cash: | $0.00 |
| Other Charges Paid in Cash:<br>$60.00 Est. Future Lien Release Fee<br>$170.00 Recording Fee | $230.00 |
| Total Charges Paid in Cash: | $230.00 |

**LIEN RELEASE FEES.** In addition to all other charges, I agree, to the extent not prohibited by law, to pay all governmental fees for release of Lender's security interests in collateral securing this loan. I will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $60.00

**AUTOMATIC PAYMENTS.** I hereby authorize Lender automatically to deduct from my Checking account account, numbered ▮▮▮▮▮▮▮▮, the amount of any loan payment. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment. At any time and for any reason, I or Lender may voluntarily terminate Automatic Payments.

**TAX CONSEQUENCES.** I understand that Lender makes no representation or warranty whatsoever concerning the tax consequences of this loan, including the deductibility of interest, and that I should consult with my own tax advisor for guidance on this subject. I also agree that Lender shall not be liable in any manner whatsoever should the interest paid on the loan not be deductible.

**AUTOMATIC PAYMENT TRANSFER DATE.** If you elect automatic payment, transfers will occur on the date scheduled with the following exceptions. 1) If the transfer is scheduled to occur on the 29th, 30th or 31st day of the month, the transfer will be scheduled for the last calendar day if the month does not contain the scheduled transfer day. 2) If the transfer is scheduled to occur on a Saturday, Sunday or holiday we are not open for business, the transfer will occur on the next business day the bank is open for business following the scheduled transfer day.

**FINANCIAL CONDITION. BY SIGNING THIS AUTHORIZATION, I REPRESENT AND WARRANT TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN MY FINANCIAL CONDITION AS DISCLOSED IN MY MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED OCTOBER 15, 2010.**

**BORROWER:**

x _____
Janice Haas

### CREDIT INSURANCE DISCLOSURE

**VOLUNTARY CREDIT INSURANCE.   CREDIT LIFE INSURANCE, CREDIT DISABILITY INSURANCE AND INVOLUNTARY UNEMPLOYMENT INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT.**

By signing below, I acknowledge that I am not obtaining credit insurance for this loan for one of the following reasons:

    (A) I am not eligible for credit insurance;

    (B) Credit insurance is not available from Lender; or

    (C) If I am eligible and credit insurance is available from Lender, I do not want it.

Prior to signing this Credit Insurance Notice on October 15, 2010, I read and understood all of the provisions of this Disclosure.

**BORROWER:**

X ~~_Jamie Haas_~~

Jamie Haas

LASER PRO Lending, Ver 5 53 10 003  Copr  Harland Financial Solutions, Inc  1997, 2010   All Rights Reserved

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jamie M. Haas | Chapter 13 |
| Debtor | Bankruptcy No. 18-11474-AMC |
| | |
| Fulton Bank of New Jersey, or its Successor or Assignee | |
| Movant | |
| vs. | |
| WILLIAM C. MILLER, Esq., Trustee | |
| Jamie M. Haas | |
| Respondents | |

### CERTIFICATION OF SERVICE OF PROOF OF CLAIM AND MORTGAGE PROOF OF CLAIM ATTACHMENT

I, Raymond M. Kempinski, attorney for Fulton Bank of New Jersey, hereby certify that I served a true and correct copy of the foregoing Proof of Claim and Mortgage Proof of Claim Attachment, by United States Mail, first class, postage prepaid, and/or electronic means, upon the following:

Date Served:

Jamie M. Haas
4419 Richmond Street
Philadelphia, PA 19137

United States Trustee
Office of the U.S. Trustee
833 Chesnut Street
Suite 500
Philadelphia, PA 19107

Brad J. Sadek
Sadek & Cooper
1315 Walnut Street
Suite 502
Philadelphia, PA 19107
Attorney for Debtor

WILLIAM C. MILLER, Esq.
Chapter 13 Trustee
P.O. Box 1229
Philadelphia, PA 19105

/s/ Raymond M. Kempinski, Esq.
ANN E. SWARTZ, ESQUIRE, ID # 201926
ALEXANDRA T. GARCIA, ESQUIRE, ID # 307280
RAYMOND M. KEMPINSKI, ESQUIRE, ID # 93839
Attorney for Fulton Bank of New Jersey
123 South Broad Street, Suite 1400
Philadelphia, PA 19109
Telephone: (215) 790-1010
Facsimile: (215) 790-1274
Email: ecfmail@mwc-law.com